# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THE PHILADELPHIA INQUIRER, et al.,

           Plaintiffs,

    v.

JOHN E. WETZEL,
IN HIS INDIVIDUAL CAPACITY AS
SECRETARY OF THE
PENNSYLVANIA DEPARTMENT OF
CORRECTIONS, et al.,

           Defendants.

Civil Action No. 1:12-cv-01917-YK
(Chief Judge Yvette Kane)

(Filed Electronically)

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

**SCHNADER HARRISON SEGAL & LEWIS LLP**

**AMERICAN CIVIL LIBERTIES FOUNDATION OF PENNSYLVANIA**

*Attorneys for plaintiffs*

# TABLE OF CONTENTS

TABLE OF CITATIONS ................................................................. ii

INTRODUCTION ........................................................................1

PROCEDURAL HISTORY ..............................................................2

STATEMENT OF FACTS ...............................................................2

STATEMENT OF THE QUESTION INVOLVED ..................................4

ARGUMENT ..............................................................................5

    A. Likelihood of Success on the Merits ...........................................5

        1. The Ninth Circuit's Decision in *CFAC* .................................6

            a. First Amendment Right to View Executions ........................7

            b. Abridging the First Amendment Right Was Not Reasonably
              Related to a Legitimate Penological Interest. ........................9

        2. There Is No Reason Why Third Circuit Law Should Deviate
           From *CFAC*. ............................................................11

    B. Irreparable Harm ...................................................................17

    C. Lack of Harm to Defendants .....................................................20

    D. Public Interest .....................................................................21

CONCLUSION ...........................................................................22

# TABLE OF CITATIONS

**Page**(s)

## CASES

*Abu-Jamal v. Price,*
    154 F.3d 128 (3d Cir. 1998) ............................................................10

*Am. Civil Liberties Union v. Reno,*
    217 F.3d 162 (3d Cir. 2000), *vacated on other grounds in Ashcroft v.*
    *ACLU*, 535 U.S. 564 (2002) ....................................................17, 18

*Associated Press v. Otter,*
    682 F.3d 821 (9th Cir. 2012) ..............................................18, 19, 20

*Cal. First Amendment Coalition v. Woodford,*
    299 F.3d 868 (9th Cir. 2002) ("*CFAC*").....................................*passim*

*Council of Alternative Political Parties v. Hooks,*
    121 F.3d 876 (3d Cir. 1997) ............................................................21

*Elrod v. Burns,*
    427 U.S. 347 (1976)..........................................................................17

*First Amendment Coalition v. Judicial Inquiry & Review Bd.,*
    784 F.2d 467 (3d Cir. 1986) ............................................................16

*Globe Newspaper Co. v. Superior Court,*
    457 U.S. 596 (1982).....................................................................7, 15

*McConnell v. Fed. Election Comm'n,*
    540 U.S. 93 (2003)............................................................................21

*N. Jersey Media Group v. Ashcroft,*
    308 F.3d 198 (3d Cir. 2002) ............................................................16

*NutraSweet Co. v. Vit-Mar Enters., Inc.,*
    112 F.3d 689 (3d Cir. 1997) ..............................................................5

*Press-Enterprise Co. v. Superior Court,*
    478 U.S. 1 (1986)................................................................7, 8, 15, 21

*Richmond Newspapers, Inc. v. Virginia,*
    448 U.S. 555 (1980).......................................................................7, 15

*Ruocchio v. United Transp. Union, Local 60*,
  181 F.3d 376 (3d Cir. 1999) ............................................................21

*Stilp v. Contino*,
  613 F.3d 405 (3d Cir. 2010) ..............................................................5

*Turner v. Safley*,
  482 U.S. 78 (1987).............................................................................10

## STATUTES AND OTHER AUTHORITIES

61 Pa. C.S. § 4305(a) .............................................................................2

Act No. 127 of 1834.............................................................................12

Fed. R. Civ. P. 65 ...................................................................................5

*First Electrocution in State Success*, PHILA. INQUIRER (Feb. 24, 1915)............12, 13

Joseph R. Daughen, *When Elmo Smith Went Killer's 'Eyes Were Popping
  With Terror'*, PHILA. DAILY NEWS (May 3, 1995) .......................................13, 14

Negley K. Teeters, *Public Executions in Pennsylvania 1682 to 1834*, 64
  JOURNAL OF THE LANCASTER COUNTY HISTORICAL SOCIETY 85 (No. 2;
  Spring 1960)....................................................................................11, 12

Pennsylvania Department of Corrections, *Information on the Execution
  Process* p. 1 (Nov. 2004), *available at* http://www.cor.state.pa.us/portal/
  server.pt/community/death_penalty/ 17351/history/607968......................12, 14

U.S. CONST. amend. I........................................................................*passim*

## **INTRODUCTION**

The Commonwealth of Pennsylvania has scheduled the executions of two condemned inmates — one on October 3 and the other on November 8, 2012. By statute, members of the public and the press must be allowed to witness those two and all other executions in Pennsylvania. It is the policy of the defendants to execute prisoners convicted of capital offenses by lethal injection *without* allowing witnesses to observe the entirety of the execution process. Instead, under the Pennsylvania Department of Corrections' Capital Case Procedure Manual, witnesses to executions are permitted *only* to observe a controlled segment of the execution process. The remainder of the execution process is obscured behind a curtain, which is unveiled by Department of Corrections ("DOC") personnel only at the moment at which the lethal injection is to be administered.

This procedure precludes any public oversight of the portions of the execution that take place behind the curtain, and thus, deprives the press, acting as a surrogate for the public, of the information necessary for the public to engage in a fully-informed debate about the methods its government has chosen to implement the most severe criminal penalty at its disposal. The procedure violates the First Amendment rights of the public and press organizations such as plaintiffs, and defendants should be enjoined from implementing it.

**PROCEDURAL HISTORY**

Plaintiffs are filing this motion in connection with their Verified Complaint.

**STATEMENT OF FACTS**

Executions of condemned individuals in Pennsylvania are carried out by lethal injection at an execution chamber located at the DOC's SCI-Rockview facility.  Complaint ¶ 11.  By state statute, six different categories of persons may witness executions, including duly accredited representatives of the news media. 61 Pa. C.S. § 4305(a).  These individuals witness executions through a window from an observation room that adjoins the execution chamber.  Complaint ¶ 12.  A curtain hangs from this window, and may be opened and closed by DOC personnel.  *Id.* ¶¶ 13, 17-18.

The DOC's protocols for conducting executions, including those that govern the opening and closing of the retractable curtain, are set forth in its Capital Case Procedure Manual.  *See* Complaint ¶ 16 & Ex. A.  The Manual states that the curtain shall remain closed while (a) the condemned inmate is transported into the chamber and strapped onto the injection table, (b) the inmate is connected to an EEG monitor, (c) the lethal injection team inserts intravenous catheters into the

inmate's arms, (d) the intravenous catheters are connected to extension and administration sets leading to saline solution, (e) the lethal injection team starts and regulates the flow of the saline solutions, (f) the lethal injection team applies leads for the electrocardiogram, and (g) the lethal injection team leaves the execution chamber. *Id.* ¶ 17. After the curtain is finally opened, the lethal injection team administers the lethal drug cocktail from a separate room. *Id.* ¶¶ 17(g), 18. There is no indication that any part of the process — either before or after the opening of the curtain — is audible to the witnesses. *Id.* ¶ 26.

These execution protocols prevent witnesses from observing the demeanor of the condemned, the guards, or the members of the lethal injection team. *Id.* ¶ 19. They also preclude observation of the amount of force, if any, needed to strap the condemned to the table; the amount of pain, if any, experienced by the inmate during the process; the complications, if any, experienced by the condemned throughout the process; the amount of time needed to complete the preparation of the inmate for his death; the content of any final statement made by the condemned immediately before the lethal drugs are administered; the conversations, if any, between and among the condemned and/or the lethal injection team indicating complications; or the efforts, if any, by the guards and/or the lethal injection team to either comfort or taunt the condemned. *Id.* ¶¶ 19, 27, 30-32. Instead, witnesses only are permitted to observe a limited segment of the

execution, controlled by the DOC, comprising the final few minutes of the process while the lethal drug cocktail is injected into the inmate and he dies. *Id.* ¶¶ 20-21.

Once the EEG monitor displays an absence of electrical activity from the condemned's body, DOC personnel re-close the curtain and a Coroner enters the room to verify that the condemned has died. *Id.* ¶¶ 22-23. The curtain is then re-opened briefly while an announcement is made to the witnesses over a public address system that the Coroner has pronounced the condemned dead. *Id.* ¶ 24. The witnesses are then escorted out of the SCI-Rockview facility. *Id.* ¶ 25.

## STATEMENT OF THE QUESTION INVOLVED

Should the Court prevent defendants from infringing the First Amendment rights of the public and the press by granting a mandatory temporary restraining order and preliminary injunction requiring defendants to: (a) conduct all phases of the execution process — starting from the earlier of: (i) the moment the condemned enters the execution chamber, or (ii) the moment the condemned is strapped to the injection table and is attached to intravenous lines, and continuing through, to and including, the time the condemned is declared dead — in the view of and audible to all witnesses to that execution; and (b) afford witnesses to an execution the ability to hear any final statement the condemned may wish to give?

*Suggested answer: Yes.*

## ARGUMENT

It is well established that a preliminary instruction is warranted where the moving party demonstrates: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting relief will not result in even greater harm to the non-moving party; and (4) that the public interest favors such relief.  *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010). These elements also apply to temporary restraining orders ("TROs").  *See NutraSweet Co. v. Vit-Mar Enters., Inc.*, 112 F.3d 689, 693 (3d Cir. 1997) (TRO continued beyond the time permissible under Fed. R. Civ. P. 65 must be treated as a preliminary injunction and must conform to the standards applicable thereto).  In this case, all four of these elements favor granting plaintiffs' requested relief.

## A.     Likelihood of Success on the Merits

The Ninth Circuit Court of Appeals has held directly and unambiguously that California's former execution protocols, which were virtually identical to Pennsylvania's current protocols in all relevant respects, violated the First Amendment rights of the public and the press to witness the entirety of executions.  The Ninth Circuit reaffirmed that holding this past summer, when it enjoined similar protocols in Idaho.  This Court should follow the Ninth Circuit's

holding (indeed, plaintiffs are aware of no other appellate court opinion addressing the issue) and grant the relief requested by plaintiffs, as the principles that underlie the Ninth Circuit's decisions are equally applicable in this Circuit.

    1.    <u>The Ninth Circuit's Decision in *CFAC*</u>

In *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002) ("*CFAC*"), two professional organizations for journalists brought a federal action against prison officials at San Quentin State Prison (where California's death row was located), seeking to enjoin executions by lethal injection from being carried out using protocols set forth in a "San Quentin Institutional Procedure."  This procedure stated that witnesses from the press and the public could observe the prison's execution chamber through a curtained window, and that the curtain would be opened only after guards tied the condemned inmate to a gurney and medical professionals inserted intravenous lines into him.  *Id.* at 871.  The plaintiffs requested an injunction to compel the defendants to permit observation of the entire execution process from the moment the condemned was escorted into the chamber.  The district court granted the injunction.  *Id.* at 872.

On appeal, the Ninth Circuit affirmed.  It concluded, first, "that the public does indeed enjoy a First Amendment right of access to view executions

from the moment the condemned is escorted into the execution chamber." *Id.* at

873.  Second, it concluded that even under a deferential standard of constitutional

review, the defendants' policy abridging this First Amendment right of access was

not reasonably related to a legitimate penological interest, notwithstanding the

defendants' protestations that concealing selected portions of the execution was

important to protect the safety of prison staff and the security of the institution.

        *a.*     *First Amendment Right to View Executions*

        In concluding that there is a First Amendment right of access for the

press and the public to view executions, the Ninth Circuit followed principles set

forth in precedents of the United States Supreme Court in *Richmond Newspapers,*

*Inc. v. Virginia*, 448 U.S. 555 (1980), and *Globe Newspaper Co. v. Superior Court*,

457 U.S. 596 (1982), which held that the press and public have a guaranteed right

under the First Amendment to access governmental proceedings, specifically,

criminal trials.  The Ninth Circuit found that this First Amendment right of access

naturally extended to executions, using a two-step rubric set forth in a related

Supreme Court case, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-9

(1986):  "(1) whether the place and process have historically been open to the press

and general public and (2) whether public access plays a significant positive role in

the functioning of the particular process in question" (internal quotation marks and alteration marks omitted).

First, the Ninth Circuit recognized that there was a centuries-old tradition of public access to executions, long pre-dating the Constitution, in the United States and in England. *See CFAC*, 299 F.3d at 875 (citing scholarly authorities). Even after "town square" executions were abolished and they were instead moved inside prison walls, executions in the United States continued to be witnessed without limitation by the public and the press. *See id.* Even "[d]uring the era of the gas chamber," which began in 1937, witnesses at California executions would "watch[] the prison staff escort the prisoner into the execution chamber (the same chamber where lethal injection executions now take place), strap him into the chair and administer the lethal gas until he was declared dead." *Id.* at 871; *see also id.* at 876. It was only in recent years, with the advent of lethal injections, that the state began to use the curtained window to prevent witnesses from observing parts of the execution process. *Id.* at 871. This recent innovation did not alter the weight of the historical tradition supporting access by the press and public.

Second, the Ninth Circuit held that public access was functionally important to the execution process, because "[a]n informed public debate is critical

in determining whether execution by lethal injection comports with the evolving standards of decency which mark the progress of a maturing society." *Id.* at 876 (internal quotation marks omitted).  Thus, without such access, the public would have no way to ascertain whether execution protocols used by the state were being administered humanely.  *Id.*  Moreover, "public observation of executions fosters the same sense of catharsis that public observation of criminal trials foster." *Id.* at 877.

>    b.    *Abridging the First Amendment Right Was Not Reasonably Related to a Legitimate Penological Interest.*

Having determined that there is a First Amendment right to view executions, the Ninth Circuit turned to the question of whether California might have had a justification for its policy restricting that right.  The Ninth Circuit first determined that it must apply the "unitary, deferential standard," under which prison regulations that burden fundamental rights are valid so long as that are "reasonably related to legitimate penological interests" and not "an exaggerated response to those concerns." *Id.* at 877-78 (internal quotation marks omitted).  The Ninth Circuit nevertheless concluded that California's concealment of parts of the execution process could not be justified by the governmental interest claimed by defendants, namely, "concern for staff safety and institutional security," which they sought to ensure by "protect[ing] the anonymity of the execution staff who . . .

face possible retaliation from prisoners in the general population or . . . from death penalty opponents." *Id.* at 880 (internal quotation marks omitted).

Specifically, the Ninth Circuit analyzed four factors to determine whether California's restrictions were reasonable:  (1) "whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open . . . ; (3) what impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally and (4) whether there exist ready alternatives that fully accommodate the . . . rights at *de minimis* cost to valid penological interests." *Id.* at 878 (quoting *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)) (internal quotation marks and alteration marks omitted); *accord Abu-Jamal v. Price*, 154 F.3d 128, 132-33 (3d Cir. 1998) (applying *Turner* four-factor test in finding prison regulation unconstitutional on First Amendment grounds).

Applying these factors, the Ninth Circuit concluded that (1) there was no rational connection between the restriction and the governmental interest of protecting execution team members.  Had there been such a connection, then such restrictions on access to ensure anonymity would have been equally necessary in the past, when California executed condemned inmates with lethal gas instead of

10

lethal injections — and yet, the identities of the execution team members had never been concealed from witnesses in the past. *CFAC*, 299 F.3d at 881. "[T]he notion of retaliation," it concluded, was "pure speculation." *Id.* at 882. The Ninth Circuit further found that (2) there were no alternate means by which members of the press and public could observe executions other than allowing them to be eyewitnesses, *id.* at 883-84; (3) accommodating the First Amendment right would have no adverse impact on guards, other inmates, or prison resources, *id.* at 884; and (4) there were ready, low-cost alternatives that California could just as easily employ to protect its execution team's anonymity — for example, by having them wear surgical garb, *id.* at 884-85. Thus, there was no justification for abridging the press's right to observe the execution in its entirety.

2.      There Is No Reason Why Third Circuit Law Should Deviate From *CFAC.*

There is nothing in either the history of Pennsylvania or the case law of the Third Circuit that supports a different result from that reached by the Ninth Circuit in *CFAC*. Indeed, historical execution practices in Pennsylvania were entirely consistent with the American and Californian traditions that the Ninth Circuit described. As in the rest of the country, executions in Pennsylvania were carried out by public hanging from its founding as a colony in 1681 through 1834. Negley K. Teeters, *Public Executions in Pennsylvania 1682 to 1834*, 64 JOURNAL

11

OF THE LANCASTER COUNTY HISTORICAL SOCIETY 85 (No. 2; Spring 1960).  In

1834, hangings were moved "within the walls or yard of the jail of the county in

which [the condemned] shall have been convicted," Act No. 127 of 1834, but state

law continued to require the presence of twelve witnesses at any execution, *id*.

("[T]he sheriff or coroner . . . shall invite the presence of . . . twelve reputable

citizens . . . . ").  In some cases, "persons in authority, notably sheriffs, permitted

hundreds and even a few thousand and more to witness executions within the jail

walls of Pennsylvania . . . ."  Teeters at 114.

In 1913, Pennsylvania began to electrocute, rather than hang, its

condemned.  *See* DOC, *Information on the Execution Process* p. 1 (Nov. 2004),

*available at* http://www.cor.state.pa.us/portal/server.pt/community/death_penalty/

17351/history/607968 ("Death Penalty FAQ").  Press accounts of Pennsylvania's

first execution by electrocution indicate that witnesses were permitted to observe

the entire execution, from the moment the condemned was brought into the

execution chamber, until he was pronounced dead:

> His hair was clipped and his trouser legs slit to the knees, and
> supported by the same two attendants, one on either side, Talap was
> led into the death chamber.  As he was backed into the chair Talap
> appeared to be badly frightened.  He half turned to look at the
> instrument of death, but was quickly settled into the chair and
> strapped in.  This required but one minute.  At 7.16 the executioner
> applied the first shock of 2200 volts.  This application was of one
> minute duration.  The current was then shut off for fifteen seconds,

and twice later applied for fifteen seconds with intervals of the same
length.  At 7.21, Talap was pronounced dead by Dr. R. J. Campbell,
the prison resident physician . . . .

*First Electrocution in State Success*, Phila. Inquirer (Feb. 24, 1915).


And press accounts of the last execution by electrocution in

Pennsylvania on April 2, 1962, also make clear that witnesses were permitted to

observe the entire execution:

A funereal voice chanting the words to "Nearer My God to Thee"
brought a subdued gasp from some of the witnesses.  The voice
belonged to the Rev. Kenneth Anderson, the Protestant chaplain, who
led a shackled Elmo Smith, surrounded by guards, into the room.
Smith's eyes were popping with terror at the enormity awaiting him.
His future, his life, would be gone in seconds.  Smith walked into the
room and, just as Cavell had predicted, sat down in the electric chair.
Swiftly, the guards were upon him, lashing his arms and legs to the
chair with the straps, fastening electrodes to his ankles and wrists.
The popping eyes disappeared behind a dark brown leather mask. The
final set of electrodes was placed on Smith's head. A soft
"hummmmmmmmm" filled the room as the executioner turned the
dials. Smith shot forward as if he had been catapulted, and my knees
instinctively clapped together in anticipation of his landing in my lap.
But the straps held him in the chair. It was 9:02 p.m., and the
executioner again turned the dials, triggering another "hummmmmm,"
but Smith only shuddered this time. Quickly, the electrician sent two
more charges coursing through Smith's body, and then he stopped.
Dr. J.G. Weizel leaned over and examined Smith. The leather mask
had been yanked up onto Smith's forehead when the first shock sent
him lunging. His mouth was twisted to the left, and a ribbon of spittle
ran down his chin. A faint but unmistakable smell suffused the room,
like burnt pork. "I pronounce Elmo Smith dead," Dr. Weizel
announced, loudly and dramatically . . . .

13

*See* Joseph R. Daughen, *When Elmo Smith Went Killer's 'Eyes Were Popping With Terror'*, PHILA. DAILY NEWS (May 3, 1995).  Indeed, not only did the witnesses observe the execution from the moment the condemned was brought into the chamber and strapped to the electric chair through the pronouncement of death, but they also were seated in the execution chamber itself with the condemned.  *See id*. ("The electric chair stood on a small platform, straps and wires dangling from it, directly across from us. No screen or glass panel separated us.").  There is no reason to believe that witnesses to the other 348 electrocutions in Pennsylvania between the first and last were not also permitted to observe the entire execution. *See Information on the Execution Process* p. 1 (noting that there were 350 total executions by electrocution in Pennsylvania).

Only three executions have been carried out in Pennsylvania since Smith's electrocution in 1962, and all three took place as recently as the 1990s after Pennsylvania began using lethal injection as its method of executing inmates.[1] As a result, it is clear that Pennsylvania's pre-1962 practices with respect to hanging and electrocution are coextensive with the relevant historical practices in this Commonwealth, and that these practices are substantively consistent with those described by the Ninth Circuit in *CFAC*.  Therefore, just as the historical

---

[1]   Pennsylvania has not executed a condemned since the Ninth Circuit issued it *CFAC* decision.

practices described in *CFAC* supported the existence of a First Amendment right to observe executions in their entirety, *see* page 8, *supra*, the historical practices particular to Pennsylvania support that same conclusion here.  Similarly, just as the historical practices described in *CFAC* showed that there was no genuine rational relationship between concealing parts of the execution process from witnesses and protecting the safety of execution team members (as no parts of the execution process were ever concealed when California used lethal gas instead of lethal injection to execute inmates), *see* page 8, *supra*, the historical practices particular to Pennsylvania again support that same conclusion in this case:  when Pennsylvania used electrocution instead of lethal injection to execute inmates, no part of the execution process was concealed from witnesses then either.

Likewise, there is nothing in the case law of this Circuit that would undermine the principles on which the Ninth Circuit based its decision in *CFAC*. Although the Third Circuit (like all other federal appeals courts apart from the Ninth Circuit) has not had occasion to delineate the scope of First Amendment rights of access in the context of executions, the general principles that the Third Circuit has followed in related contexts are consistent with the principles that underlie *CFAC*, all of which are derived from settled United States Supreme Court precedents including *Richmond Newspaper*, *Globe Newspaper*, and *Press-Enterprise*.  Support for this conclusion can be found even in cases in which the

Third Circuit has declined to recognize First Amendment rights.  For instance, in

*North Jersey Media Group v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002), the Third

Circuit held that there was no First Amendment right to access deportation

hearings, and in *First Amendment Coalition v. Judicial Inquiry & Review Board*,

784 F.2d 467 (3d Cir. 1986), it held that there was no First Amendment right to

access judicial discipline proceedings.  But in both cases, it did so because there is

no historical tradition of public access to either deportation hearings or judicial

discipline proceedings — the same inquiry that the Ninth Circuit used in *CFAC* to

determine that there was a right to access executions.  *See N. Jersey Media*, 308

F.3d at 211 ("Noting preliminarily that the question whether a proceeding has been

'historically open' is only arguably an objective inquiry, we nonetheless find that

based on both Supreme Court and Third Circuit precedents, the tradition of open

deportation hearings is too recent and inconsistent to support a First Amendment

right of access."); *First Amendment Coalition*, 784 F.2d at 472 ("But the cases

defining a right of access to trials are, at best, of limited usefulness in the context

of the fundamentally different procedures of judicial disciplinary boards.  These

administrative proceedings, unlike conventional criminal and civil trials, do not

have a long history of openness.").  In both cases, the Third Circuit made it clear

that what ultimately matters is whether there is a historical tradition of public

access, and for executions, there emphatically is such a tradition, in Pennsylvania, in California, and across the country.

Thus, as the factual premises on which the Ninth Circuit relied in *CFAC* are likewise present in this case, and as the legal principles on which the Ninth Circuit relied are consistent with the law of this Circuit, this Court should follow *CFAC* and hold that plaintiffs are likely to succeed on the merits. Plaintiffs have a First Amendment right to observe the entirety of executions carried out by defendants, and the restrictions on that access set forth in the Capital Case Procedure Manual are not reasonably related to a legitimate governmental interest.

## B.    Irreparable Harm

The second element that a moving party must establish to obtain a temporary restraining order or preliminary injunction is irreparable harm to the moving party if relief is denied. Where the challenged procedure restricts First Amendment rights, the irreparable harm element is presumed to weigh in favor of injunctive relief: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality); *see also Am. Civil Liberties Union v. Reno*, 217 F.3d 162, 180 (3d Cir. 2000) (generally in First Amendment challenges, plaintiffs who meet the merits prong of the test for a preliminary injunction "will

almost certainly meet the second, since irreparable injury normally arises out of the deprivation of speech rights" (internal citation omitted)), *vacated on other grounds in Ashcroft v. ACLU*, 535 U.S. 564 (2002).

This principle applies equally in this case, for reasons that the Ninth Circuit articulated earlier this year in *Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012) (reaffirming *CFAC*).  In *Otter*, plaintiff news organizations brought an action against officials of the State of Idaho, seeking to enjoin them from conducting executions under a protocol limiting press access in a manner that was highly similar to the protocols at issue in *CFAC* and in this case.  The defendants argued, and the district court agreed, that carrying out executions under Idaho's protocol would cause no irreparable harm and thus that a preliminary injunction was not warranted, "because witnesses still would be allowed to see the execution process from the time after the inmate is restrained and IVs are placed and because there will most likely be other executions in the future."  682 F.3d at 825 (internal quotation marks omitted).

On appeal, the Ninth Circuit reversed.  First, it rejected the suggestion that since part of the execution would be observable, there would be no irreparable harm.  Under *CFAC*, there was a First Amendment right to access the entire execution process, and "[t]o say that the plaintiffs will not suffer harm because

they will be able to witness part of [inmate's] execution is like saying that the public would not suffer harm were it allowed to read only a portion of the *New York Times*." *Id.* at 825-26.  Second, the Ninth Circuit rejected the argument that because other executions would take place in the future, there was no irreparable harm in unconstitutionally denying press access to the entirety of the next one scheduled.  "That the plaintiffs may be able to observe future executions in Idaho does not mean that they are unharmed by the denial of their right to observe *this* execution." *Id.* at 826.

Precisely the same reasoning applies here.  Allowing press access to part of an execution in Pennsylvania does not relieve the harm caused by denying access to the rest of the execution, and allowing press access to future executions in Pennsylvania does not relieve the harm caused by denying access to the next execution, which is presently scheduled for October 3, 2012.  The press must exercise oversight over all executions to inform the public debate, to ensure humane punishment, and to foster catharsis.  *See CFAC*, 299 F.3d at 876-77. Preventing the press from exercising that oversight even once creates irreparable harm.  Plaintiffs' request for a temporary restraining order and preliminary injunction must be granted to eliminate the harm.

## C.     Lack of Harm to Defendants

Third, to obtain a temporary restraining order or preliminary injunction, a moving party must show that granting such relief will not result in even greater harm to the non-moving party.  As the Ninth Circuit in *Otter* also found, there is simply no harm that defendants here will suffer if plaintiff's motion is granted.  The defendants in *Otter* argued that they would be harmed by a preliminary injunction because it would delay Idaho's next scheduled execution. The Ninth Circuit rejected the defendant's argument, as it saw "no realistic possibility" that the execution would be delayed by an injunction compelling the State to comply with *CFAC*, particularly considering "the minimal changes that an injunction might require."  682 F.3d at 826.

The same logic holds in this case.  The changes that plaintiffs' requested relief would compel defendants to make — opening a curtain earlier than it otherwise would have and leaving it open — are straightforward, would require virtually no effort by defendants and certainly would not harm them.  Should defendants wish to make modifications to the protocols to specify additional actions the guards and lethal injection team members may take to conceal their identities, it is free to do so.  But that *choice* by defendants would not constitute harm to them.

**D.    Public Interest**

Finally, to obtain a temporary restraining order or preliminary injunction, a moving party must show that granting such relief will be in the public's interest.  Protecting constitutional rights almost always is in the public's interest: "[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights . . . ."  *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 884 (3d Cir. 1997).  This is especially so in the context of the First Amendment, which includes some of our most cherished freedoms.  *See McConnell v. Fed. Election Comm'n* , 540 U.S. 93, 255 (2003) (Scalia J., concurring); *Ruocchio v. United Transp. Union, Local 60*, 181 F.3d 376, 386 (3d Cir. 1999) (First Amendment freedoms are "so fundamental that . . . the uncertainty created by a vaguely worded prohibition of speech is injurious . . . .").

The public interest is specifically advanced here, where the speech at issue is designed to expand public awareness of a critical social issue.  As discussed above, *see* pages 8-9, *supra*, one of the very reasons why there is a right under the First Amendment to access governmental proceedings in the first place is that such public access plays a significant positive role in the functioning of these processes.  *See Press-Enterprise*, 478 U.S. at 8-9.  As the Ninth Circuit in *CFAC* concluded, ensuring public access serves the public's interest in the execution

process by informing the public debate and fostering the catharsis that capital

punishment is intended to serve.  *CFAC*, 299 F.3d at 876-77.

## **CONCLUSION**

For the foregoing reasons, plaintiffs respectfully request that the Court

grant their Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

| | |
|---|---|
| SCHNADER HARRISON SEGAL & LEWIS LLP | AMERICAN CIVIL LIBERTIES FOUNDATION OF PENNSYLVANIA |
| /s/ Paul H. Titus | |
| Paul H. Titus (PA1399) | Witold J. Walczak (PA62976) |
| 120 Fifth Avenue, Suite 2700 | 313 Atwood Street |
| Pittsburgh, PA 15222-3001 | Pittsburgh, PA 15213 |
| ptitus@schnader.com | vwalczak@aclupa.org |
| (412) 577-5200 (tel) | (412) 681-7864 (tel) |
| (412) 765-3858 (fax) | (412) 681-8707 (fax) |
| | |
| Stephen J. Shapiro (PA83961)* | Mary Catherine Roper (PA71107) |
| H. Justin Park  (PA92007)* | P.O. Box 40008 |
| 1600 Market Street, Suite 3600 | Philadelphia, PA 19106 |
| Philadelphia, PA  19103-7286 | mroper@aclupa.org |
| sshapiro@schnader.com | (215) 592-1513 (tel) |
| jpark@schnader.com | (215) 592-1343 (fax) |
| (215) 751-2000 (tel) | |
| (215) 751-2205 (fax) | |

\* Application seeking special admission
pursuant to LR 83.8.2.1 will be filed.

*Attorneys for plaintiffs.*

Dated:  September 26, 2012

## <u>CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMIT</u>

Pursuant to Local Rule 7.8(b)(2), I hereby certify that the foregoing document — Plaintiffs' Memorandum of Law in Support of its Motion for Temporary Restraining Order and Preliminary Injunction — does not exceed 5,000 words. The memorandum, exclusive of the cover page, table of contents, table of citations, and signature block, contains 4,941 words.

/s/ Paul H. Titus
Paul H. Titus

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Plaintiffs'

Memorandum of Law in Support of Their Motion for Temporary Restraining

Order and Preliminary Injunction shall be served with the Summons and

Complaint in this case and that, on this 26th day of September, 2012, I also caused

a copy of the memorandum to be served via electronic mail upon:

> Amy Zapp
> Chief Deputy Attorney General
> Office of Attorney General
> 16th Floor – Strawberry Square
> Harrisburg, PA 17120
> azapp@attorneygeneral.gov


> /s/ Paul H. Titus
> Paul H. Titus