**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THE PHILADELPHIA INQUIRER, et al.,** | : | |
| **Plaintiffs** | : | |
| | : | **Civ. No. 12-cv-01917** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **JOHN E. WETZEL, in his individual** | : | |
| **capacity as Secretary of the Pennsylvania** | : | |
| **Department of Corrections, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Before the Court is Plaintiffs' motion for a temporary restraining order and preliminary injunction directing officials of the Pennsylvania Department of Corrections to permit them, or other press members designated as witnesses, full visual and auditory access to executions conducted in the Commonwealth of Pennsylvania, including an execution scheduled for November 8, 2012. (Doc. No. 4.) Defendants have filed a brief in opposition. (Doc. No. 17.) At a hearing conducted on October 17, 2012, the Court heard argument and received testimony, documents and transcripts of testimony agreed to by the parties. (Doc. No. 32.) For the reasons that follow, the Court will grant Plaintiffs' motion.

**I.     BACKGROUND**

On November 8, 2012, the Commonwealth of Pennsylvania will execute Hubert Michael by lethal injection pursuant to a detailed written protocol adopted in 2012. Because the protocol limits the ability of Plaintiffs, The Philadelphia Inquirer and The Patriot-News, and other witnesses to see and hear all phases of the execution, Plaintiffs request that the Court order

Defendants, the Pennsylvania Department of Corrections (DOC) and its agents, to conduct all phases of Mr. Michael's execution in view of and audible to all witnesses present at the execution.  (Doc. No. 4 at 2.)  Plaintiff <u>The Patriot-News</u> has been selected to witness Mr. Michael's execution from the observation room adjoining the execution chamber.  (Doc. No. 31.)

The parties have identified no factual dispute concerning the DOC Capital Case Procedure Manual's lethal injection protocols.  (Doc. No. 5 at 5.)  As written, the current protocol requires that a curtain between the injection chamber and the witness observation room be closed during three phases of the execution process: (1) the entry of the inmate and the lethal injection team's medical preparation of the inmate for the execution, (2) any necessary consciousness check after the administration of the first drug, and (3) the coroner's examination of the inmate following the administration of the final two lethal injection drugs.  The curtain between the injection chamber and witness room is therefore opened and closed up to three times during the execution.

First, the curtain is closed while the inmate enters the execution chamber, and remains closed while the inmate is secured to the table, the lethal injection team (LIT) enters the chamber, the LIT connects the inmate to the EEG and ECG monitors, and the LIT inserts two intravenous catheters in the inmate's forearms to commence the flow of saline solutions.  Upon completing all connections, the LIT returns to the injection control room.  The Major-of-the-Guard or designee, who remains in the injection chamber to make a written record of all activity, will remove the surgical mask from the inmate, and cover the inmate with a sheet.  Once the Capital Facility Manager gives the order to proceed with the execution, the Major-of-the-Guard opens the curtain between the lethal injection chamber and the witness room for the first time.

2

After the LIT completes their remote administration of the first drug from a separate room, the curtain may or may not close depending on whether an EEG monitor is being used for the execution.  If an EEG monitor is used, the LIT checks the EEG monitors to determine whether the inmate is unconscious from effect of the first drug.  If the EEG monitor does not conclusively show that the inmate is unconscious, the designee will close the curtains between the injection chamber and the witness room and the LIT will then enter the injection chamber to perform a consciousness check by tactile stimulation.  If the LIT determines that the inmate is unconscious following this check, the LIT returns to the injection room and the curtains are again opened between the injection chamber and the witness room.  If the EEG monitor is not being used for this particular execution, the designee closes the curtain to permit the LIT to enter the injection chamber and perform a manual consciousness check, at the conclusion of which the LIT leaves the injection chamber and the curtain is drawn open again.  At this point, if the inmate appears to be unconscious, the LIT will administer the final two drugs remotely from the injection room.

Once the final two drugs have been administered, and the LIT observes an absence of electrical activity on the ECG monitor, an LIT member will notify the Capital Facility manager or designee that injection of the drugs has been completed.  The designee will then draw the curtains closed for a third time, at which point the Coroner will enter the injection chamber to determine that the inmate died following the lethal injection.   Following the conclusion of the Coroner's examination and his exit from the injection chamber, the curtain between the chamber and the witness room will be opened.

The dispute centers on whether these limitations comport with First Amendment

standards.  Plaintiffs maintain that the First Amendment guarantees them the right to observe the execution without visual or auditory obstructions.  Plaintiffs contend that they should be allowed to observe and report on whether the inmate experiences pain during the execution, the content of any statement made by the inmate, any conversation that the medical team and the inmate engage in prior to the administration of the lethal injection drugs, and any complications resulting from the administration of the drugs.  (Doc. No. 5 at 3.)  Defendants argue that Plaintiffs have no First Amendment right to witness the portions of the process from which they are now excluded, and that Plaintiffs have not satisfied the standards of injunctive relief.  (Doc. No. 17.)

## II.    LEGAL STANDARD

A preliminary injunction is warranted when the moving party demonstrates: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the non-moving party; and (4) that the public interest favors such relief.  Stilp v. Contino, 613 F.3d 405, 409 (3d Cir. 2010). Although the moving party must produce evidence to convince the Court that all four factors favor relief, as a practical matter, likelihood of success on the merits and irreparable injury are the most important elements.  Am. Tel. & Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994).

## III.   DISCUSSION

Plaintiffs assert that they have satisfied all four elements necessary to grant a preliminary injunction.  First,  Plaintiffs argue they would likely prevail on the merits, arguing that the Court should recognize their First Amendment right to view executions under Richmond Newspapers,

Inc. v. Virginia, 448 U.S. 555 (1980), and the United States Court of Appeals for the Ninth

Circuit's decision in California First Amendment Coalition v. Woodford, 299 F.3d 868 (9th Cir.

2002).  (Doc. No. 5 at 6-7.)  Second, Plaintiffs maintain that the loss of their First Amendment

right to view the execution, even for a minimal period of time, constitutes irreparable injury.  (Id.

at 21.)  Finally, Plaintiffs argue that granting the preliminary injunction would not result in harm

to Defendants, and the requested relief would be in the public interest.  (Id. at 24-25.)  The Court

will address each of Plaintiffs' arguments and Defendants' responses thereto in turn.

  **A.  Likelihood of Success on the Merits**

  The precise legal question Plaintiffs present finds no ready answer.  Although the

important right of the press to witness and report on government action has long been recognized

as essential to our democracy, no Supreme Court or Third Circuit opinion addresses the right of

the press to witness fully and report on state-sponsored executions.  Plaintiffs urge this Court to

simply defer to the Ninth Circuit's decision in Woodford.  (Id. at 7.)  The Court, while cognizant

that federal courts should respect each other's efforts, is equally aware that "[b]inding precedent

for all is set only by the Supreme Court, and for the district courts within a circuit, only by the

court of appeals for that circuit," meaning that each federal court has an obligation to engage

independently in reasoned analysis.  In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d

1171, 1176 (D.C. Cir. 1987) (Ginsburg, J.).

  Generally, the law does not recognize a First Amendment right of the press to gather

information, but rather, recognizes a right only to obtain access where the public is entitled to

access.  See Zemel v. Rusk, 318 U.S. 1, 17 (1965).  The Supreme Court first analyzed the

contours of First Amendment access to governmental proceedings in Richmond Newspapers.  In

<u>Richmond Newspapers</u>, the Supreme Court examined the First Amendment right of the press and public to attend judicial proceedings.  There, the Supreme Court found that the right of the press and public to attend criminal trials is "implicit" in the guarantees of the First Amendment.  448 U.S. 555, 580 (1980) (plurality).  Drawing on the "unbroken, uncontradicted history" of public access to criminal trials, the Court found that a "presumption of openness inhere[s] in the very nature of a criminal trial under our system of justice," and therefore the right of the public and press to attend criminal trials is guaranteed under the First Amendment to the United States Constitution.  <u>Id.</u> at 574.  Justice Brennan wrote a concurring opinion in <u>Richmond Newspapers</u>, recommending that courts weigh two considerations when evaluating whether a presumptive right of public access exists: the "experience" prong, by which the court considers whether the public has historically been granted access to the place or process; and the "logic prong," which requires the court to consider whether access enhances the functioning of the particular process in question.  <u>Id.</u> at 589 (Brennan, J., concurring).  If both prongs are satisfied, a qualified First Amendment right of public access attaches.  <u>Id.</u>  This qualified right can be overcome by "specific, on the record findings" that indicate closure of the government proceedings is "essential" to preserve higher values and is narrowly tailored to serve that interest.  <u>Globe Newspaper Co. v. Superior Court</u>, 457 U.S. 596, 606 (1982).

Following the decision in <u>Richmond Newspapers</u>, the Supreme Court adopted Justice Brennan's two-prong analysis, noting in its subsequent decisions that the "two complementary considerations" of history and logic are used to determine whether a First Amendment right of public access exists.  <u>Press-Enter. Co. v. Superior Court (Press-Enter II)</u>, 478 U.S. 1, 8-14 (1986); <u>see also</u> <u>N. Jersey Media Group, Inc.</u>, 308 F.3d at 206 ("[A] majority of the Court has

since adopted Justice Brennan's language as a test."). Using the "history and logic" test, the Supreme Court found a qualified First Amendment right of public access to other judicial proceedings, including preliminary hearings, voir dire, and the testimony of victimized children. Press-Enter. II, 478 U.S. at 8-14; Press-Enter. Co. v. Superior Court, 464 U.S. 501, 510-511 (1984); Globe Newspaper, 457 U.S. at 604. The Supreme Court offered twin justifications for adopting the historical prong, explaining that not only does the Constitution carry "the gloss of history," but, also, that a historical tradition of accessibility implies the favorable judgment of experience. Globe Newspaper, 457 U.S. at 605 (citation and quotation marks omitted). With respect to the logic prong, the Supreme Court explained that ensuring the press has the right to witness and report on governmental proceedings is an "essential" component in our structure of self-government, and therefore courts should evaluate whether the press access sought will enhance both the proceeding and democracy in general. Id. at 606.

The Supreme Court's opinions in Richmond Newspapers and its progeny focused on proceedings in the context of criminal trials. The United States Court of Appeals for the Third Circuit has been "less reticent in its extensions" of Richmond Newspapers. N. Jersey Media Group, 308 F.3d at 207. Guided by Richmond Newspapers' "history and logic" test, the Third Circuit has determined the right of public access to diverse governmental proceedings, as the Court is called upon to do here.[1] Although the Third Circuit has questioned whether Richmond

---

[1] The Third Circuit has applied the Richmond Newspapers test to the following: evidence introduced at a criminal trial, United States v. Criden, 648 F.2d 814 (3d Cir. 1981); civil trials, Publicker Industries, Inc. v. Cohen, 733 F.2d 1059 (3d Cir. 1984); state environmental agency records, Capital Cities Media, Inc. v. Chester, 797 F.2d 1164 (3d Cir. 1986); proceedings before the Pennsylvania Judicial Inquiry and Review board, First Amendment Coalition v. Judicial Inquiry & Review Board, 784 F.2d 467 (3d Cir. 1986); post-trial examinations of jurors, United States v. Simone, 14 F.3d 833 (3d Cir. 1994); township

Newspapers should apply outside judicial proceedings, finding its wide-ranging applicability

"open to debate as a theoretical matter," the Third Circuit has acknowledged that given its

extensive precedent, "in this Court, Richmond Newspapers is a test broadly applicable to issues

of access to government proceedings." N. Jersey Media Group, 308 F.3d at 201, 208-09.

 The Third Circuit has closely hewed to the Supreme Court's two-prong analysis in its

public access jurisprudence, emphasizing that courts must find both that the "place and process

has historically been open to the press and general public," and that "public access plays a

significant positive role in the functioning of the particular process in question." Whiteland

Woods, 193 F.3d at 181.  Assuming a First Amendment right of public access attaches to the

place or process, the Third Circuit has found that courts "need not postulate a span as extensive

as that in civil and criminal trials," but should instead be guided by the "unique history and

function" of the process in question.  First Amendment Coal. v. Judicial Inquiry & Review Bd.,

784 F.2d 467, 472 (3d Cir. 1986).

 Applying both prongs of Richmond Newspapers, the Third Circuit has emphasized the

importance of the historical prong, finding that arguments about whether the public's

participation enhances the functioning of the process in question "cannot carry the day . . .

because it has not developed independent of, and unrelated to, historical antecedents." Judicial

Inquiry Review Bd., 784 F.2d at 473.  The Third Circuit has defended its reliance on the

historical prong, observing that "the role of history in the access determination is integral" in

part because of the Supreme Court's own emphasis on historical access in Globe Newspaper and

---

planning commission meetings, Whiteland Woods, L.P. v. Twp. of W. Whiteland, 193 F.3d 177
(3d Cir. 1999), and deportation hearings, North Jersey Media Group, Inc. v. Ashcroft, 308 F.3d
198 (3d Cir. 2002).

Press-Enterprise I.[2]  Capital Cities Media, Inc. v. Chester, 797 F.2d 1164, 1174 (3d Cir. 1986).

With respect to the "logic prong," the Third Circuit has identified six factors traditionally

served by public participation in governmental proceedings: (1) promotion of informed

discussion of governmental affairs by providing the public with the more complete

understanding of the judicial system, (2) promotion of the public perception of fairness which

can be achieved only by permitting full public view of the proceedings, (3) providing a

significant community therapeutic value as an outlet for community concern, hostility, and

emotion, (4) serving as a check on corrupt practices by exposing the judicial process to public

scrutiny, (5) enhancement of the performance of all involved, and (6) discouragement of perjury.

United States v. Simone, 14 F.3d 833, 839 (3d Cir. 1994) (quoting United States v. Smith, 787

F.2d 111,114 (3d Cir. 1986)).  Although these factors were conceived in the context of public

access to judicial proceedings, the Third Circuit has applied these factors outside the judicial

context.  See N. Jersey Media Group, 308 F.3d at 217; Whiteland Woods, 193 F.3d at 181.

In this case, Plaintiffs are challenging portions of the DOC's lethal injection protocol that

prohibit media witnesses from viewing executions without auditory or visual obstruction.  (Doc.

No. 5 at 5.)  As such, the Third Circuit's decision in North Jersey Media Group, Inc. is

particularly instructive because, there, the court evaluated whether an executive directive that

mandated closing "special interest" deportation hearings complied with the First Amendment.

308 F.3d at 204.  After analyzing both prongs, the Third Circuit found that the press did not

enjoy a First Amendment right of qualified access to deportation hearings.  First, the court found

---

[2] The United States Court of Appeals for the District of Columbia Circuit has commented on the Third Circuit's emphasis on the historical prong, observing that the Third Circuit "take[s] the view that without such a [historical] tradition, a claim to access cannot succeed."  JB Pictures, Inc. v. Dep't. of Def., 86 F.3d 236, 239 (D.C. Cir. 1996).

that deportation hearings had historically been conducted in prisons, hospitals, and private homes, meaning that the hearings were not historically conducted in places boasting a general right of public access.  Id. at 212.  Because the deportation hearings did not boast an "unbroken, uncontradicted history" of public access similar to criminal or civil trials, the Third Circuit found an "insufficient tradition of openness" to support finding a First Amendment right of access attached on the first prong.  Id. at 215.  On the second prong, the court found that although permitting press access to deportation hearings satisfied each of the six factors identified by the Third Circuit in Simone, the government had presented substantial evidence that open deportation hearings would threaten national security.  Id. at 217.  Because the plaintiffs had failed to make the required showing on both prongs, the Third Circuit held that no First Amendment right of public access to "special interest" deportation hearings existed.  Id. at 221.

Here, Plaintiffs rely on Richmond Newspapers' two-prong test to argue that the press, acting as a surrogate for the public, has a First Amendment right to view the entirety of executions conducted by the DOC.  (Doc. No. 5 at 7.)  As a threshold issue, Defendants argue that Richmond Newspapers is inapplicable.  First, Defendants argue that Richmond Newspapers does not apply because criminal courtrooms are very different from executions. (Doc. No. 32 at 26:20-23; Doc. No. 17 at 9-10.)  Second, Defendants maintain that public access to executions is a question for the state legislature and controlled by Supreme Court precedent concerning press access to prisons.  (Doc. No. 17 at 6.)  The Court will address each argument in turn.

Defendants argue that the access Plaintiffs seek is foreclosed by the Supreme Court's decision in Houchins v. KQED, Inc., 438 U.S. 1, 9 (1978).  (Id.)  There, the Supreme Court found that the media's role in providing information about conditions in penal facilities

"afford[s] no basis for reading into the Constitution a right of the public or the media to enter these institutions," and concluded that access to prisons is a question of policy for the legislative body.  Houchins, 438 U.S. at 9; see also Pell v. Procunier, 417 U.S. 817, 834 (1974) ("[N]ewsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public);  Saxbe v. Wash. Post Co., 417 U.S. 843, 849-50 (1974).

 Defendants correctly posit that Supreme Court precedent does not support a First Amendment right of the press to enter prisons for newsgathering purposes.  However, Defendants err in concluding that Houchins applies to Plaintiffs' facts.  Executions in Pennsylvania are not conducted inside penal institutions.[3]  (Doc. No. 32 at 32:16-25.)  By statute, all executions occur at the State Correctional Institute at Rockview (SCI-Rockview).  In June 1997, the execution complex at SCI-Rockview was moved outside the prison's perimeter to a former field hospital, meaning that media witnesses are no longer required to enter the facility to view an execution.   Accordingly, the Court's analysis in this case is not controlled by Houchins, as Plaintiffs do not seek access to SCI-Rockview, but instead seek access to the purpose-built execution complex that was designed, in part, for their own convenience and safety.[4]  Similar to reporters who are allowed access to courtrooms during trials under Richmond, but not allowed comparable access to a judge's or jury's private chambers, Plaintiffs here seek access to the execution complex and the execution, not the internal workings of the prison.

_____

[3] Information on the Execution Process, Pennsylvania Department of Corrections, pg.2 (Press Office September 2012), available at http://www.portal.state.pa.us/portal/server.pt/community/death_penalty/ 17351.

[4] The relocation of the execution complex enhanced the "safety and security" of media witnesses arriving to view executions.  Information on the Execution Process.

11

Even if Plaintiffs did have to enter SCI-Rockview in order to view the execution, the Court must reject Defendants' argument that <u>Houchins</u> would control the Court's result.  Here, Plaintiffs seek press access to a state-administered execution.  (Doc. No. 32 at 12:2-5.)  Under Pennsylvania law, up to six media witnesses are allowed to view and report on the execution.  61 Pa. C.S. § 4305(a).  The DOC's press office has developed a procedure to determine which press representatives will be allowed to view the execution, evaluating whether the press representative had covered the crime or trial.  (Doc. No. 32 at 13:2-8.)  The process by which media witnesses are selected to view and report on executions is therefore highly regulated and collaterally provided for by state statute.  Plaintiffs' request to view the entire execution, and not the limited portion currently allowed by the DOC, can be read as an extension of current procedures permitting their viewing of the execution.  It is therefore quite different from the relief sought in <u>Houchins</u>, where plaintiffs sought "unregulated access" and impromptu tours of the prison.  438 U.S. 1 at 5.  Accordingly, the Court rejects Defendant's argument that <u>Houchins</u> controls the Court's analysis.

The Court next turns to whether <u>Richmond</u> is the correct test to apply to Plaintiffs' requested relief.  Here, Plaintiffs challenge portions of the lethal injection protocol contained in the Capital Case Procedure Manual, a policy promulgated by the DOC.  (Doc. No. 5 at 6.)  While Defendants correctly point out that the Supreme Court has only had occasion to revisit <u>Richmond</u> in the context of criminal proceedings, the Third Circuit has found <u>Richmond</u> controlling in the context of civil and administrative proceedings, including executive directives. <u>N. Jersey Media Group</u>, 308 F.3d at 208-09.   Because the protocol now at issue mandates closure of a governmental proceeding, the Court finds that under Supreme Court and Third

Circuit precedent,  Richmond Newspapers is the appropriate test to apply.  The Court will

address each prong in turn, addressing the historical prong first, and then proceeding to the logic

prong.

Plaintiffs argue that the history of executions in Pennsylvania supports finding the first

prong of Richmond Newspapers is satisfied, claiming that historical tradition in Pennsylvania

favors open executions.  (Doc. No. 5 at 11.)  Plaintiffs rely on several historical sources that

demonstrate that witnesses were able to view every phase of the execution until recent changes

to the DOC's lethal injection protocol.  (Id.; Doc. No. 32 at 32:20-23.)   Defendants, on the other

hand, argue that executions have been private since 1834, when the Pennsylvania General

Assembly abolished public hangings.  (Doc. No. 17 at 5.)

Pennsylvania abolished public executions before the Civil War, passing an "Act to

Abolish Public Executions" on April 10, 1834.  See Michael H. Reggio, History of the Death

Penalty, in Society's Final Solution: A History and Discussion of the Death Penalty (Laura E.

Randa, ed., 1997).  Although public hangings were moved into the confines of the county

penitentiary, the state still required the presence of twelve reputable witnesses to attend the

executions.  Negley K. Teeters, Public Executions in Pennsylvania 1682 to 1834, 64 Journal of

the Lancaster County Historical Society, No. 2, 114 (Spring 1960).  Later accounts of executions

held in Pennsylvania also indicate that witnesses were allowed to view all phases of the

execution, even after Pennsylvania substituted the electric chair for death by hanging condemned

inmates.  See, e.g., Joseph R. Daughen, When Elmo Smith Went Killer's 'Eyes Were Popping

With Terror', Philadelphia Daily News (May 3, 1995);  First Electrocution in State Success, The

Philadelphia Inquirer (Feb. 24, 1915).

The Court finds that historical practice in Pennsylvania indicates that the public and press have traditionally enjoyed a right of access to executions.  Even after Pennsylvania abolished public hangings, witnesses were still invited to view the entirety of the hanging.  Later historical accounts of execution by electrocution also make clear that media witnesses were allowed to view the execution without visual or auditory obstruction.  Therefore, the Court finds that Defendants' argument that Pennsylvania determined to make executions "private" in 1834 to be unavailing, as the historical practice in Pennsylvania indicates that witnesses were present at all stages of the execution even after public hangings were abolished.  Accordingly, the Court finds that Plaintiffs have demonstrated reasonable probability of success on the historical prong of Richmond Newspapers.

The Court turns now to the "logic prong."  Plaintiffs argue that the current lethal injection protocol prevents them from exercising public oversight and therefore deprives them of the information necessary for the public to engage in a fully informed debate about the death penalty.  (Doc. No. 5 at 5.)  In response, Defendants argue that Plaintiffs are not entitled to a right of access under this reasoning because the First Amendment does not create any per se right of access to government activities simply because such access might lead to more thorough or better reporting.  (Doc. No. 17 at 11.)

Applying the "logic prong" factors developed by the Third Circuit, this Court finds that permitting the press to view the entire execution without visual or auditory obstruction contributes to the proper functioning of the execution process.  First, allowing the press to report on the entire method of execution may promote a more informed discussion of the death penalty.  Second, it may promote the public perception of fairness and transparency concerning the death

penalty, which can only be achieved by permitting full public view of the execution.  Allowing

the press to view the entire execution also provides significant community therapeutic value, as

well as exposes the execution process to public scrutiny.  See United States v. Simone, 14 F.3d

833, 839 (3d Cir. 1994) (quoting United States v. Smith, 787 F.2d 111,114 (3d Cir. 1986)).

 Moreover, full access to Pennsylvania's process and experience will allow for a more

thorough evaluation of how the Commonwealth's procedures comport with evolving

constitutional standards, especially as the legal analysis is now focused on the precise phases of

the execution that the Commonwealth plans to conduct behind a closed curtain.  Condemned

inmates challenging the constitutionality of state lethal injection protocols have claimed that the

potential failure of state agencies to properly follow their lethal injection protocols will lead to

severe pain when the drugs are administered, thus violating the Eighth Amendment's prohibition

on cruel and unusual punishment.  See Baze v. Rees, 553 U.S. 35, 44-46, 49 (2008); Jackson v.

Danberg, 656 F.3d 157, 162-63 (3d Cir. 2011).  The portion of the execution process  that

Defendants wish to obscure from Plaintiffs' view are the exact portions at issue in Baze and

Jackson, meaning that the press would be prevented from witnessing whether the

Commonwealth's administration of the death penalty complies with the parameters announced

by the Supreme Court in Baze.  Accordingly, the Court finds that permitting the press to witness

all phases of the execution contributes to the proper functioning of the execution process, in part

because it allows the press to contribute to an informed discussion of the Commonwealth's lethal

injection procedures.

 Plaintiffs have made a sufficient showing on both the history and logic prongs under

Richmond Newspapers and this Circuit's precedent.  The Court's inquiry, however, does not end

15

here.  Under the Supreme Court's decisions in <u>Richmond Newspapers</u> and its progeny and the Third Circuit's own precedent, the focus now shifts to whether Defendants have produced specific, on the record findings that indicate obstructing certain phases of the execution process is "necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest."  <u>Globe Newspaper</u>, 457 U.S. at 607; <u>First Amendment Coal.</u>, 784 F.2d at 472.

At the oral argument and evidentiary hearing, the Court asked both parties what evidence would need to be introduced into the record were the Court to find that the press enjoyed a qualified First Amendment right of access to executions.  (Doc. No. 32 at 42:12-15.)  Plaintiffs claimed that introducing the most current version of the lethal injection protocol, and other depositions taken in the course of discovery, would be sufficient for this Court to decide the dispute.  (Doc. No. 32 at 42:16-25, 43:1-2.)  Defendants, in response to the Court's query, cited interrogatories and depositions taken in the course of discovery.  (Doc. No. 32 at 43:16-20.)  At the conclusion of the hearing, the Court received these documents, testimony, and transcripts of testimony as exhibits.  (Doc. No. 32.)  The Court will thus decide whether Defendants have produced evidence sufficient to overcome Plaintiffs' qualified First Amendment right on the basis of the pleadings and exhibits received so far.

Defendants do not articulate specific factors that would limit Plaintiffs' qualified First Amendment right in their brief, but instead present these factors as part of the Court's irreparable harm inquiry.  (Doc. No. 17 at 14.)  The Court will consider them here, even though they have not been raised in response to Plaintiffs' likelihood of success on the merits arguments. Defendants first argue that they are required under 61 Pa. Stat. § 4305(c) to keep the identity of DOC employees participating in executions confidential, and that the safety and security of the

individuals participating in the execution could be compromised were the curtain to remain open during the execution.  (Doc. No. 17 at 14.)  Defendants also claim, without citation of the record, that granting Plaintiffs' requested relief would "impact" the DOC's ability to carry out the execution scheduled for November 8, 2012.  (Doc. No. 17 at 14-15.)  At oral argument, Defendants restated these arguments, contending that drawing the curtain was the only way to protect the identity of the LIT, and that wearing surgical garb would be insufficient to conceal the identities of LIT members.  (Doc. No. 32 at 29:9-19, 30:1-11.)  One of the exhibits submitted during the evidentiary hearing was the testimony of Mariosa Lamas, Superintendent of SCI-Rockview.  During Superintendent Lamas's deposition, she cited the potential for unpredictably "boisterous responses" from the execution witnesses that could endanger facility staff were the curtain to remain open for the entirety of the execution.  (Ex. Lamas at 67:20-21.)  Ms. Lamas acknowledged, however, that she was not personally aware of "any instances" from Pennsylvania or any other state where individuals who participated in an execution were subsequently threatened or put in danger.  (Ex. Lamas at 72:4.)  Ms. Lamas also cited concerns that LIT members could be attacked by individuals attending a nearby college campus or that they could be incited to riot, following dissemination of information about the executions held at SCI-Rockview.  (Ex. Lamas at 77:16, 78:1-25.)  However, Ms. Lamas acknowledged that she was not personally aware of any instances where the public reacted negatively from information being disseminated about the execution process, and subsequently attacked prison officials or LIT members.  (Ex. Lamas at 79:6-11.)  Finally, Ms. Lamas also cites the possibility that inmates might find out that certain staff are required for the execution process were the curtain to remain open, thus jeopardizing the security of SCI-Rockview.  (Ex. Lamas at 76:14-25.)

On review, the Court finds that protecting the lethal injection team constitutes a significant governmental interest.  The Court does not find, however, that this interest outweighs Plaintiffs' First Amendment right of public access to the extent that a curtain must obscure the execution chamber whenever the lethal injection team is present.  First, Defendants have not cited any incidents where prison officials were harmed after inmates were hanged or electrocuted in full view of press witnesses.  Given that inmates have been executed in full view of witnesses for over one hundred years without incident, the Court is hard-pressed to conclude that Defendants' choice to obscure the chamber is proportionate to the perceived risk of harm.  Second, Defendants have not articulated a reason why the lethal injection team cannot take affirmative steps beyond wearing surgical garb to conceal their identifying characteristics, nor do Defendants cite any instances where inmates became aware of the LIT members' identities and subsequently retaliated against them.  Furthermore, Defendants provide no support for their argument that the DOC would be prevented from proceeding with the execution scheduled for November 8, 2012.  Accordingly, the Court finds that Plaintiffs would likely be able to establish that their First Amendment right under Richmond Newspapers outweighs Defendants' articulated interest in maintaining lethal injection team confidentiality.

In conclusion, the Court finds that Plaintiffs have made a sufficient showing on each prong of Richmond Newspapers to support finding that Plaintiffs enjoy a First Amendment right of qualified public access to executions.  The Court also finds that Defendants' choice to obscure certain phases of the execution is not narrowly tailored to the substantial governmental interest in protecting lethal injection team anonymity, and therefore is unlikely to outweigh Plaintiffs' First Amendment right to view the execution without obstruction.  Accordingly, the Court finds

that Plaintiffs have shown likelihood of success on the merits on their motion for a preliminary injunction.

**B.      Irreparable Harm**

In addition to showing likelihood of success on the merits, Plaintiffs must also show that denying the requested relief would result in irreparable injury.  Plaintiffs argue that preventing the press from exercising oversight over an execution constitutes irreparable harm because the press must exercise oversight over all executions to inform the public debate, ensure humane punishment, and foster catharsis.  (Doc. No. 5 at 19.)   Defendants, in response, argue that Plaintiffs should wait for the Court to fashion a remedy in the future, contending that Plaintiffs' alleged injury is not sufficiently immediate to warrant finding that a preliminary injunction is appropriate.  (Doc. No. 17 at 12.)

It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of times, unquestionably constitutes irreparable injury."  Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality); Stilp v. Contino, 613 F.3d 405, 409 (3d Cir. 2010).  Here, Plaintiffs have established likelihood of success on the merits of their First Amendment claim.  Accordingly, the Court finds that Plaintiffs have demonstrated irreparable injury were the Court to deny their request for a preliminary injunction.

**C.      Lack of Harm to Defendants**

A moving party must also show that granting the preliminary injunction would not result in even greater harm to the non-moving party.  Here, Plaintiffs ague that their requested relief would only compel Defendants to open a curtain earlier than it would otherwise be open and to leave it open for the duration of the execution, thereby requiring "virtually no effort by

defendants" and unlikely to harm them.  (Doc. No. 5 at 24.)  Plaintiffs further argue that

Defendants' <u>choice</u> to take additional actions to conceal their identities would not constitute

harm to them.  (<u>Id.</u>)  Defendants argue they would suffer significant harm were the Court to

order the requested relief.  First, they contend that the DOC is required by statute to conceal the

identities of those persons involved in the administration of the death penalty.  (Doc. No. 17 at

14.)  Second, Defendants argue that they have a genuine interest in protecting the identities of

the lethal injection team members, as recognition of team members may subject team members

and loved ones to physical attack or condemnation.  (<u>Id.</u>)  Finally, Defendants argue, without

detail, that ordering Defendants to carry out the scheduled execution on November 8, 2012

without any visual or auditory obstruction would "seriously impact" the DOC's ability to carry

out that execution.  (<u>Id.</u> at 15.)

 The Court finds that granting the preliminary injunction would not result in "even greater

harm" to Defendants.  The Court is aware that Defendants are required by statute to keep the

identities of lethal injection team members confidential.  Here, Defendants can take affirmative

steps to keep the identities of the lethal injection team members confidential, while respecting

Plaintiffs' First Amendment right to view the entire execution.  Without further detail or

evidence, the Court cannot evaluate Defendants' argument that the requested relief will impact

their ability to carry out the execution of Hubert Michael on November 8, 2012.   Accordingly,

the Court finds that Plaintiffs have prevailed on this factor.

  **D.** **Public Interest**

 The final element a moving party must show on a motion for preliminary injunction is

that granting relief will be in the public's interest. Plaintiffs argue that granting relief will be in

the public interest, as the speech at issue is designed to expand public awareness of a critical

social issue.  (Doc. No. 5 at 25.)  Returning to their arguments made in favor of finding a First

Amendment right, Plaintiffs further argue that public access to executions plays a positive role in

the functioning of the execution process and democracy as a whole.  (Id.)  In response,

Defendants argue, without legal analysis, that the statutes enacted by the Pennsylvania General

Assembly best indicate the public interest.  (Doc. No. 17 at 15.)

The Third Circuit has determined that "[a]s a practical matter, if a plaintiff demonstrates

both a likelihood of success on the merits and irreparable injury, it will almost always be the case

that the public interest will favor the plaintiff."  Am. Tel. & Co., 42 F.3d at 1427 n.8.  Other

courts have recognized the significant public interest in upholding First Amendment principles.

See, e.g., Homans v. Alburquerque, 264 F.3d 1240, 1244 (10th Cir. 2001);  Iowa Right to Life

Comm'n v. Williams, 187 F.3d 963, 970 (8th Cir. 1999).

The Court finds that Plaintiffs have shown that granting their requested relief will be in

the public interest, as the relief will uphold the First Amendment principles laid out by the

Supreme Court in Richmond Newspapers and its progeny.  Additionally, allowing reporters full

access to the execution will contribute to the "wide freedom in matters of adult public discourse"

guaranteed by the First Amendment.  See McCauley v. University of the Virgin Islands, 618

F.3d 232, 242 (3d Cir. 2010) (citation and quotation marks omitted).

## IV.    CONCLUSION

Plaintiffs have made a sufficient showing on each element required for a preliminary

injunction.  An order consistent with this memorandum follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THE PHILADELPHIA INQUIRER, <u>et al</u>.,** | : | |
| **Plaintiffs** | : | |
| | : | **Civ. No. 12-cv-01917** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **JOHN E. WETZEL, in his individual** | : | |
| **capacity as Secretary of the Pennsylvania** | : | |
| **Department of Corrections, <u>et al</u>.,** | : | |
| **Defendants** | : | |

## <u>ORDER</u>

**AND NOW,** on this 6th day of November 2012, for the reasons set forth in the Court's memorandum opinion filed herewith, **IT IS HEREBY ORDERED THAT** Plaintiffs' motion for a preliminary injunction  (Doc. No. 4) is **GRANTED**.  Defendant, its officers, agents, servants, employees, attorneys, representatives and assigns, and all those acting in concert with it, are enjoined from preventing witnesses from full visual and auditory observation of the execution scheduled for November 8, 2012 at SCI-Rockview.

<u>S/ Yvette Kane</u>
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania

22